All right, Mr. Foster, whenever you're ready to start with the Skidmore case, we'd be pleased to hear from you. Morning, Your Honors. May it please the Court, my name is Jason Foster, and I represent Tammy Skidmore in this matter. For over 100 years, Ms. Skidmore and her predecessors in title have owned a piece of property in Kincaid, West Virginia. They look out their front porch onto Luke Creek. Behind them are woods and a hillside. In front of them is the creek. On the other side of the creek are Norfolk Southern's rail lines, and then the road that runs through Kincaid on the other side of the rail lines. So it's important to understand the geography of this case to understand the nature of why this claim is governed solely by West Virginia law. And there is no basis for federal jurisdiction in this case. All of Norfolk Southern's rail lines are on the opposite side of Luke Creek from my client's residence. There never has been any rail activity on my client's side of the property. In fact, the strip of land that brings us here today is very narrow and would not be able to support any function of the railroad whatsoever. And Norfolk Southern has introduced no evidence into the record that it ever planned to, ever did, ever can, or ever will use it for railroad operations. So again, this slice of property has been under the exclusive control of my clients and her predecessors in title for over a century. During that time, she's built a portion of her house onto the disputed property and a section of a walkway and also a part of the bridge that is used to cross over onto her property. Not once has Norfolk Southern or any of its lessees ever raised an objection to this or told her, hey, you don't own this property. In full view of the entire world, she has used this property as her own. And now that Norfolk Southern has installed a drainage pipe slightly upstream from her property, that property has begun to erode away. And is there any evidence that Norfolk Southern abandoned the property? I mean, the fact that property is not improved wouldn't necessarily mean it's abandoned. That is true, Your Honor. However, abandonment has a special meaning in the world of the ICCTA, and that deals exclusively with the service of the rail line itself, the tracks itself. So when the ICCTA talks about abandonment of rail service, it's actually trackage. It's actually transportation. It's saying, hey, either a private party can do it or the railroad itself can go to the service transportation board and say, hey, we want to abandon rail service on this line. We don't want to use these rails anymore. And the plaintiff in this case, or Ms. Skidmore in this case, is not saying they can't use their rail lines. And it's not even a crossing case like the Fifth Circuit was facing in Franks, which it found was not subject to ordinary preemption doctrines for a crossing. So this is not a crossing of tracks issue. This is not an abandonment of tracks issue. This is a small sliver of land that is literally eroding away that the Norfolk Southern has never used and could never use for any of the rail purposes that are laid out under the ICCTA. Well, I mean, that's probably a case for further factual development. But what we're dealing with here is a very preliminary question of jurisdiction. And the question is whether a claim of adverse possession, not just your claim, because as I say, the factual development is of whether adverse possession lies or whatever. That seems to me a different question from the threshold question of jurisdiction. And so I don't understand why a common law claim such as adverse possession can interfere with the operations of a railroad as much as a statute or regulation can. I mean, that's what Congress was concerned about, which was interference with railroad operations. The whole impetus for the act was that rail transportation was getting squeezed and disadvantaged by newer modes of transportation or by highways, by trucking, by air, by shipping. And you read the background to this ICCTA, and there's a feeling that the national transportation structure has to be a varied one and that all parts of it, not just trucking and shipping and air flights, but railroads, have an important part to play and that regulation, whatever that means, can come through a common law cause of action simply because a common law cause of action such as this has the same ability to interfere. So that's what concerns me from the standpoint of the jurisdictional question. Your Honor, if I may, I agree with every word that you just said. And all of those concerns regarding the uniform nature of the ICCTA are absolutely right. As a matter of fact, this court, a panel of this court in the Edwards case recently back in December, addressed the issue that common law claims can fall under ICCTA preemption. However, it is important that we maintain the distinction between the doctrine of complete preemption, which creates federal jurisdiction, and the defensive doctrines of ordinary preemption, which do not. Ordinary preemption is an affirmative defense, and even though a state claim may raise the central issue of a federal defense, it does not confer federal jurisdiction. The state court here in West Virginia can apply the ordinary preemption doctrines equally as the federal courts. So the question is, does the complete preemption doctrine apply in this case to provide a basis for federal jurisdiction? And the question of the defenses of ordinary preemption are reserved for later in this argument. But the threshold issue, the cart that we cannot get ahead of the horse is, does the complete preemption doctrine apply to... I mean, I certainly understand the difference between ordinary preemption, which is in the form of a defense, an affirmative defense in state court, and complete preemption, which transfers jurisdiction to the federal courts. But with respect to the doctrine of complete preemption, Congress has charged the Surface Transportation Board with the authority to administer this statute. And I was under the view, or was questioning, whether the Surface Transportation Board had taken the view that state common law claims were indeed preempted by this statute, because there were cases before the Surface Transportation Board where there were condemnation actions by local governments and the STB held those condemnation actions to be preempted because of a loss of railroad rights at issue. And so I'm wondering whether we owe some form of Chevron deference to the STB when it looked at condemnation actions which were brought by local government. It's true, but which is different from a formal statute or reg. And I'm just wondering whether in light of those cases, which I read, and I'm just wondering whether there's some Chevron deference owed to the Surface Transportation Board here. Your Honor, I do not believe that Chevron deference applies in this case because the cases that you refer to from the Surface Transportation Board apply the defensive doctrines of preemption. Now they call it something a little bit different than what the courts do. The courts usually discuss ordinary defensive preemption and express and imply. However, the Surface Transportation Board uses different terms, categorical and as applied. They're roughly analogous. But again, those are fact dependent and those determine whether or not a claim is preempted under ordinary preemption analysis. I was not able to locate and Norfolk Southern has not directed my attention or the court's attention to a case in which the Surface Transportation Board has discussed the complete preemption doctrine. Well, they wouldn't have had occasion to. I wouldn't think because the case doesn't arise before the Surface Transportation Board after it has been removed from state court to federal court. So I'm not sure that the complete preemption doctrine doesn't arise before the agency in the sense that it would before the federal court because the agency is not resolving questions of federal jurisdiction. I agree, Your Honor, and that's why I believe that Chevron deference to a jurisdictional determination for subject matter jurisdiction is not appropriate in this case. However, this court's decision in L'Anse v. Tharpe does lay out the proper analytical framework. And in L'Anse, this court has stated that state law complaints usually must stay in state court when they assert what appear to be state law claims. And the court also said that the sine qua non of a complete preemption doctrine is a pre existing federal cause of action that can be brought in the district courts. That has to appear. That cause of action has to appear in the statute itself, and it does not. In this case, Your Honor, the congressional intent that the state law be entirely displaced must be clear in the statute, and it is not. Furthermore, Mr. Foster, can I ask you about that? Are you saying that unless there is a remedy available under the relevant federal statute that you can never have a case of complete preemption? Not only a remedy, Your Honor, but a cause of action. The case law is clear that you have to have both a cause of action and a remedy. If you don't, there isn't federal question jurisdiction. That doesn't mean the ordinary preemption doctrines don't apply. They still do with complete force and effect. It's just a question of which court is going to be responsible for applying those doctrines. Well, I mean, but in the Fifth Circuit case that I think you mentioned earlier that dealt with railroad track operations and switches, there was a claim of negligence per se and then simple negligence. And the Fifth Circuit indicated in that case that the claim of negligence per se was preempted, notwithstanding that there was a state court statutory remedy. And I don't think the court then went on to say that it mattered whether or not there was an alternative remedy under the federal regulations. It just said the claim was preempted. End of story. So I don't understand why you're suggesting that there has to be a remedy or else there can never be complete preemption. Well, a couple of things, Your Honor. The case I was referring to earlier was Frank's, and I believe the case you're referring to now is Elam. And Elam, the question of federal jurisdiction was not before the Fifth Circuit, and they applied ordinary preemption doctrines in that case to find that the negligence per se was preempted under ordinary preemption doctrines because the anti-blocking statute basically said how long trains could stay at crossings. And they said in that case that the circuit said you can't tell a train how long it has to wait on its tracks because that directly involves regulation of rail transportation. The negligence alone in and of itself is not subject to ordinary preemption. And the reason I keep going back to this test that the Fourth Circuit uses for complete preemption is because it appears in the case law and the United States Supreme Court has used the doctrine very sparingly and has actually recognized it under only three statutes, the National Banking Act, ERISA, and the Labor Management Relations Act. So it's a very narrow doctrine to begin with, and it's a very specific test that has to be met. Can I go back to this Elam? Whenever the, in whatever state or county, the case may arise, and just as a matter of practicality, this particular claim may not seem to pose much of an interference, although I suspect it does in terms of its impact on drainage of the railroad tracks because the railroad's interest in it. And its route, you know, it's not just between the rails. It doesn't, you know, extends beyond the tracks proper. And when you have a local landowner posited against this big, bad interstate enterprise, like the railroad, that's a hard environment for the railroad to operate. Make its, make its case. It just, as a matter of fact, it is. And the character of a railroad is interstate in nature, and it implicates the same sort of interest that the Constitution assigns to Congress under the Commerce Power. This is not an intrastate matter. It's really an interstate matter. And I think that at least part of the purpose of this ICTA was to have matters that implicate interstate commercial interest be free from home cooking kind of situations. And this is what concerns me about saying, oh, well, there's no federal jurisdiction here. I just wonder whether we really go completely against the purposes of the Act because the ordinary preemption doctrine, which is by nature of an affirmative defense, is very different from complete preemption because it's the setting that matters. It's the courtroom that matters. I mean, I'm a great believer in federalism and standing up for the sovereign prerogatives of states, but the federal government also has an interest, is embodied in interstate transportation in the Commerce Clause. And I just don't want it chewed up. And I appreciate your case, and I think it's a good one. It's a serious one. But I wanted to lay bare to you what my concerns are. Your Honor, I see that I'm over my time, and I'm happy to address those concerns now, or I have some time left. Why don't you go ahead and address them now? Your Honor, one case that I wanted to get to that I haven't had an opportunity yet is the PCS phosphate case from this court that was decided back in 2009. That involved private agreements between railroad companies and third parties. And in that case, the Fourth Circuit found that neither express nor implied preemption defensive doctrines applied. Of course, again, that was not a jurisdictional case. However, the court's discussion of the ICCTA in that case, I believe, goes to your concerns. And in that case, the court stated, Congress narrowly tailored the ICCTA preemption provision to displace only regulation, i.e., those state laws that may reasonably stand to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation. So the ICCTA was not meant to displace all state laws across the board. The question and the purpose behind the ICCTA was not interference, say, with track crossings and negligence claims, because those are permitted and those are allowed to be filed in state court. But it's the direct economic regulation of rail transportation. You didn't want to have to take freight from West Virginia to California, go through 15 states and have to pay 15 different fees and get 15 different permits. So the question really is, under the ICCTA, and the harms that it was trying to prevent is, are you directly trying to regulate the economic aspects of rail transportation? And the history is clear from this court's unprecedented that laws that have a more remote or incidental effect are not within the scope of the ICCTA. And I lay in bed at night and sometimes think, what could be more remote or incidental? But there's no language in the statute that says that it's confined only to economic regulation. That's correct, Your Honor. If you look at the express preemption portion of the statute itself, it speaks. And it's the second sentence, and it says, except as otherwise provided in this part, speaking of 49 U.S.C. 101.01, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under federal or state law. So it really is economic regulation. And if you look through the entire statute, there's no preexisting federal cause of action that deals with state property claims, just like there's no preexisting cause of action for a breach of contract claim, which this court has already found is not subject to ordinary preemption doctrines in the PCS phosphate case. All right. Thank you very much. And you have some rebuttal time, and we'll prepare to hear from Mr. Atkin. Before we move on, I know we're way over, but I did have one question I was trying to ask. Yes. I'm sorry, Judge Agee. Mr. Forrester, hold back, because Judge Agee has a question for you. Yes, sir. I may be remembering incorrectly from the record of the briefs, but I thought I recollected that the claim that you have brought with respect to the railroad property, even though it's a common law adverse possession claim, could have been brought before the Surface Transportation Board by way of an application. Is that correct? That was an argument that was made by counsel in response to the additional authority that I cited. Briefing was closed by the time this court decided the Edwards case in December of this year. I filed a notice of additional authorities. Norfolk Southerners counsel responded, stating that this could have been brought before the Surface Transportation Board. And in that particular filing, let me pull it up here real quick. That statute deals with the abandonment of rail lines. It's not the abandonment of railroad property in general. So if you take a look at the statute itself, it is confined exclusively to the abandonment of rail lines, and I'm pulling up the site right now. It's 49 U.S.C. Section 10903, and it says Section A.1, a rail carrier providing transportation subject to the jurisdiction of the Board under this part, who intends to, A, abandon any part of its railroad lines, or B, discontinue the operation of all rail transportation over any part of its railroad lines. So that can be brought directly before the Surface Transportation Board, Your Honor, and that is categorically not what the state law claim in this case is trying to do. We don't want to do anything to the rail lines. We don't want to touch the operations. We're not trying to even get an easement for a crossing. We're just saying, hey, the property across the creek from you guys that you haven't used for 100 years, that you've let us use for ourselves, all we're saying is you can't just put in a pipe and let that wash away. You can't destroy our property in that way, and those property damages claims are not available to be brought before the Surface Transportation Board. All right. Thank you. Yes, Your Honor. Mr. Atkins, we'd be pleased to hear from you. Thank you, Your Honors. Raymond Atkins for Norfolk Southern. I'd like to begin by answering the questions that were asked by Judge Diaz and Judge Agee, and then turn to the product questions presented by Judge Wilkinson about the role of the railroads in interstate commerce. Let me start with Judge Diaz. Your question was whether or not there has to be a remedy under the law in order for there to be complete preemption. And then you asked about the Elam case in the Fifth Circuit. So let me just first correct the record. The Elam case is a complete preemption case. The Fifth Circuit very carefully walks through the doctrine to try to distinguish between those state law claims that might be ordinarily preempted but can't rise to the level necessary for federal question jurisdiction from those that don't. And in that case, Your Honors, there is no remedy available at the STB for a block crossing. But what the court said is it still fell within the heart of the scope of the Interstate Commerce Act sufficient to create federal question jurisdiction, distinguishing the issue of jurisdiction from the remedy. And so then also you ask, does it have to be a remedy?  The doctrine itself is a little opaque. But the one point that the Supreme Court has made continuously is that the remedy can be significantly different or not even exist compared to the one that's available in state law. So I would look at the Caterpillar case, Your Honor. It's an interesting case because the issue that was presented to the Supreme Court was whether this was a labor act type case. The question was whether the underlying state action fell within the scope of federal law. The Supreme Court ruled that it didn't. But it took the pains to correct the lower court's decision that said that there also had to be a remedy. And the Supreme Court said that's not the case. It really just needs to fall within the scope of the Interstate Commerce Act sufficient to create federal question jurisdiction, which we submit is present here. Can I ask a follow up to that, Mr. Atkins? Thank you for that clarification. So in this case, did the district court conduct that analysis here? I mean, did the court actually consider whether or not there was a remedy before deciding to dismiss the case? So it did not, Your Honor, because this claim was not presented to the district court. So when the plaintiff challenged the removal, they, of course, get to indicate what they think was deficient in that removal order. And they argued that there was a timing issue. And then they argued pretty strenuously that you can't have complete preemption unless you have complete preemption. Unless you preempt all forms of state regulation, then you can't have complete preemption as to this particular cause of action. So the district court did address those issues. And then they also argued that there was no ordinary preemption because the land in question wasn't really being used for rail service, which is also a question that the district court addressed. It really wasn't until the rebuttal in the briefing before this court where the issue about whether it sort of fell within the scope of the Interstate Commerce Act and how closely the remedy needs to mirror it really became a live issue. I will confess you can find a sentence or two in the opening briefs. But the focus of the opening briefs was on the phosphate case and whether or not you completely preempt all forms of state regulation, whether that's a prerequisite for complete preemption. So let me then turn, if I may, to Judge Adjee's question. I hope I pronounced that correctly. Apologies, Honor. Which is, well, could they have brought this type of claim to the STB? And I submit the answer to that is yes. So property owners, the states, sometimes they want to forcefully remove property from the interstate rail network. It happens occasionally. It's not done with any frequency. But since at least the 1940s, the Supreme Court has recognized that parties, property owners, can file a petition to the ICC, now the STB, to try to seek an order from them saying that this property is not necessary and force the railroads to remove it from the interstate rail network. We referenced the 10903. That is what's referred to in the literature as an adverse abandonment, where you're forcing the railroad to abandon the line. The STB has struggled sometimes. Cases don't fit smoothly into 10903. So my opponent suggests that maybe this particular piece of property might not fit smoothly in 10903. In those circumstances, though, the STB has provided an alternative path for folks to get that kind of relief from the STB. This comes up frequently when somebody wants to force a railroad to abandon something that might be in a yard or a sidetrack. Those types of facilities are expressly exempted from the requirements of 10903. So you cannot bring an adverse abandonment case if you have a problem with somebody's yard or a siding or a spur track. That's just not available under the statute. But the STB has crafted another mechanism. And it's not really terribly surprising because the overall thrust of the Interstate Commerce Act is to have the one centralized federal regulator who is responsible for the exit and entry and exit in this space. And there is an overarching national interest in keeping these corridors intact. And so the Supreme Court — sorry, not the Supreme Court — the STB, in the Geale case, which is one of the leading cases on this expressive question, looked very carefully about how problematic would it be if plaintiffs could use state adverse possession claims to chip away at the existing freight rail network. And the board concluded that that is contrary to the plain language of the statute. It's contrary to the legislative history behind the active preemption provision. And it's contrary to the overarching national interest in securing these corridors. So that kind of leads us to the last question, I think, in deciding whether there was at least jurisdiction to hear this case for rural purposes, which is what was the property sufficiently related to rail transportation in order to trigger all of these national considerations. And there, there's a couple of cases that we refer you to. I think the best one is the Seventh Circuit's decision in the CTA case. Here, though — and so the question is, it doesn't have to be — they don't have to be trying to take the track itself. Every track in America has property on either side of it that is just as important as the track itself. Sometimes it's used for access, road access. Sometimes it's used to create sidings. But in this circumstance, it's there to provide for drainage. So if you don't have appropriate drainage for a railroad, a rail bed, you're not going to have a rail line for very long. And so the record in this case established that this is an 100-year flood zone. And so that Norfolk Southern 100 years ago made sure to acquire sufficient property on each side of the right-of-way so that they can control the flow of water. So you'd have no standing water above or on either side of the right-of-way. So they secured 75 feet, which, you know, doesn't seem like a lot. As we say in the briefing, it's less than the distance to the third base. But it's there for a purpose. And it's clear that permitting a property owner to forcefully remove that property from the interstate rail network would require Norfolk Southern to change its operations. It would have to find a different way to control the flood zone. So I'd say that those factors together should be sufficient to satisfy the complete preemption doctrine. Let me ask you. If the plaintiffs here made an application to the STB for the damage to their property, their adverse possession claim, would the railroad take the position that they were not considering the merits, but take the position that they were barred from making the application? It's possible, Your Honor. So I just want to be very transparent. It depends entirely on the relief that they ask for at the STB. So the relief that's available under federal law for a adverse possession type claim, which is the claim that we think creates jurisdiction, is different than what's available under federal law. So you cannot go to the STB and ask the STB for an order to declare that this property belongs to the plaintiff under any theory under the Interstate Commerce Act. That issue actually went to the STB after a case was removed out of state court to federal court under the complete preemption doctrine. That adverse possession claim was referred to the STB. The STB said that that relief doesn't exist. So those are just kind of the facts I've got to deal with. But I don't think that, Your Honor, defeats the complete preemption doctrine because, again, the Supreme Court has said that the remedies can be different. So in one of the cases at the Supreme Court, the remedy that they wanted in state court was an injunction to stop a labor strike. This is the very first complete preemption case. It went up to the Supreme Court. The Supreme Court said that it satisfies the complete preemption doctrine, so it was appropriate to remove it in the federal court. But they observed that the injunction wasn't available, that it's an unavailable remedy under federal law. I think, actually, the lower court said that, and the Supreme Court just declined to rule on the issue because they said it didn't matter. It didn't matter to the question of jurisdiction because the remedies can be different. And here, Your Honor, there's no question the remedies are not the same. However, if they do go to the STB and they secure an order, now that property is no longer within the interstate rail network. Now all of the state claims, tort claims, state regulation, everything can apply with full force to that piece of property. But until they actually remove this property from the interstate rail network, and the only way to remove it is through the federal regulatory agency, this type of cause of action is categorically or expressly preempted. And I would submit, Your Honor, that it falls sufficiently within the scope of the Interstate Commerce Act to satisfy the complete preemption doctrine. So it's your view that if the plaintiffs or someone similarly situated went to the Surface Transportation Board and asked that the, in this case, the property on their side of the creek were released from the railroad corridor, they could then proceed against Norfolk Southern and state court to make an adverse possession claim? Is that where it comes out? Yes, Your Honor. I believe that's right. Now, whether they could win in state court under state law, I have no idea. But so long as the federal sort of umbrella of protection for the railroad corridor exists, a adverse possession claim simply doesn't exist. It gets subsumed by federal law, and you need an order from the STB to remove that protection, an STB order compelling the property to be removed out of the interstate rail network. Otherwise, that is a state law that is unequivocally regulating rail transportation. Because what it's saying is you may no longer use this property for rail service. Mr. Atkins, can I follow up on that? Absolutely. The statute in this case, the relevant statute, provides jurisdiction both to the STB and to federal courts. So why couldn't the district court make that initial declaration as to whether or not the land lies within or without the corridor? That's a good question, Your Honor. So there's no question that the district court can rule on the preemption question, whether or not it falls in or without. I would submit, Your Honor, this bill would fall under the primary jurisdiction doctrine. So the primary jurisdiction doctrine is in place for this type of circumstance, where although the district court has jurisdiction to entertain the questions arising under the Interstate Commerce Act, that there is a judicial sort of prudence consideration where you really want to direct that inquiry to the agency that has the competent expertise. If the district court referred the issue to the STB, it still has jurisdiction over the case. The STB's decision then goes back to the district court, who sits in an appellate role and reviews the STB's decision. So I think that would be the appropriate recourse. If somebody wanted to bring that type of claim in federal district court, I think it would immediately get referred to the STB under that doctrine. And honestly, I think it might be an abuse of discretion for a district court not to refer that type of question to the federal agency. So what are we supposed to do in this case? Isn't that what should happen here? So the ordinary course in these type of cases is when a state law claim is preempted, you pull it up and you just say it's preempted, and then you look to see if the other causes of action survive. This is not a dismissal with prejudice to bring some sort of action before the STB. It's not a dismissal with prejudice to bring some other federal claim that might be permissible under the Interstate Commerce Act. It's just a question of is this state law claim preempted, which it is, a whole series of cases finding that it's preempted, and then do any of the other claims survive once it's clear that they don't have a property interest in the property that the claim is damaged. And the district court, I think, appropriately ruled that the majority of those claims were dismissed on mootness grounds, and then the only claim that the district court looked at a little more carefully, even if they don't own the property in question, the bank itself that's eroding, might there be a claim under West Virginia law that the railroad still needs to take into consideration the property that they do own? And in that case, the district court said there just weren't enough facts alleged in the complaint to survive a motion to dismiss. So I think the appropriate recourse here, Your Honor, is to affirm, uphold the importance, the important federal question, jurisdiction question about complete preemption, and then once you agree that, or if you agree that this type of adverse possession claim, it cannot proceed under state law, I mean, that it's preempted, then I think the rest of the case naturally goes to the district court. The reason I ask that is because we have some authority in the... I'm sorry. Go ahead, JJ. I'm sorry. Go ahead. I was going to ask, in this circumstance, if we agreed with you, and then the plaintiff came back with a separate proceeding in federal court and asked, under the statute, that their side of the creek be abandoned or removed from the rail network, and either the district court make that decision or refer it to the STP, SDB, would the railroad take the position that they are either collaterally estopped or barred by race judicata from bringing such a claim? That's a really good question, Your Honor. I hesitate to take a position on that. I hope you have a really good answer. It's possible that we might argue that they should be estopped because it was something they could have put into the complaint, and they chose not to, but I feel like I just can't take a position. I haven't thought that through carefully enough, Your Honor, to know if that would or would not be, but I don't think it affects the fundamental question of jurisdiction. Did the district court have jurisdiction for removal purposes? And I think the answer there is reasonably clear. To follow up on Judge Agee's question, so we have some authority in the context of ERISA where we have indicated to federal district court judges that even when a claim is completely preempted under ERISA, that the district court judge's obligation at that point, or at least a suggestion, is that he or she should take the initiative to convert the claim into the proper claim that would apply under the relevant statute. So why wouldn't we simply send this case back to the district court and say, you know, cause of action that lies appropriately under the statute, and decide whether you or, in the first instance, the surface transportation board should decide the matter? Your Honor, I would just suggest that that should have been a comment on the plaintiff, not on the district court. Although I'm not familiar with that line of precedent, so maybe you have ruled that even if it was never presented to the district court, they still had an independent obligation. But I think here, you know, like the Elam case, which was on a very similar footing, there was no suggestion at the district court level that a referral to the STB was sought by the plaintiff, that they sought to actually seek an abandonment, which, Your Honor, would be wise on their part, because the standard for granting that under the Industry Commerce Act is very high, very unlikely that they would actually satisfy it. So they wanted to pursue just their claim under adverse possession, and I don't necessarily think it would be an abuse of discretion on the district court's part not to have transformed it into a claim they weren't asking for, or to make a referral that wasn't sought. So I would just argue, in these circumstances, maybe you could give guidance to future applicants, but to suggest that the district court erred by not referring a matter to the STB when they weren't asked to be referred, or to create a new federal cause of action that the plaintiffs did not try to pursue, I don't think would be appropriate in these circumstances. I would imagine that the situation we face here could become a fairly commonplace one. As I mentioned earlier, the railroad's interest under the statute don't begin and end between the two rails, and there are going to be a lot of situations where the railroad has essentially done nothing and hasn't improved the property. It may be important to railroad operations, but things have laid basically dormant over a long period of time, and so it's almost ripe for a claim of abandonment, because these properties are often going to be near the property line of the plaintiff, and they're also going to be near the auxiliary activities that a railroad needs to run. So you have this thing that's sort of in the borderland, in a way, and there may not have been a great degree of activity or improvement for a prolonged period of time. And so I think that there could be an awful lot of adverse possession claims. This strikes me as a fairly—if we held that it was not completely preempted, I wonder if we'd be opening the door to a great many claims of this nature and whether that would be in tension with the basic aims of the statute. Yes, Your Honor. So I see my time has expired, if I have your permission to answer the question. Yeah, please. I couldn't agree with you more. Just if you take a step back, Norfolk Southern operates 20,000 miles in the eastern half of the United States, and they would die a death by a thousand cuts if every person, property owner, who abutted those rail lines could simply carve away slivers and slivers of the rail corridor, which is why the STB, when it looked at this issue very carefully in the G.L. case, it really spoke to the importance that the Congress placed on preserving these rail corridors, not just the entire line but also the slivers on either side of it. And it set a very high bar for forcing the removal or permitting these types of claims to go forward because the STB is not just concerned about the present use of that property but the future use of that property. So, you know, we have seen the STB say that an attempt to condemn or use adverse obsession of even a rail bank line is... Well, you know, I mean, I'm just thinking my personal experience. I ride Amtrak a good bit of the time, and one of the nice things about it is it has a pretty wide window, and even in short runs between Charlottesville and Washington or whatever, I am amazed at the number of pieces of property of all descriptions that fly by. And the layout of the land is somewhat like it is here. There's a sort of unimproved parcel of land that marks the sort of boundaries between the railroad's operations and the property behind it. And very often it may be swamp land or it may be just land that's not put to any particular use, but there's a great deal of that. And I think if each one of those properties that I drive by or that the train drives by is going to be the subject of an adverse possession action, and the claim is going to be that because the railroad hasn't improved it or isn't using it in a highly visible way that somehow it's relinquished its right to the property, the multiplicity of the claims would be staggering, and they would be resolved in a forum in which the dynamic is completely adverse to the railroad and to our national transportation structure. It could be just chewed up by this kind of thing. And that's the very thing that I think the statute was passed to avoid, this kind of thing. But I mean, there's a lot of danger lurking here in the potential for litigation in a forum that I think the railroad would find itself at a very distinct disadvantage because the decision makers in the case can tend to look, not in all cases, but in many cases, can place a priority upon parochial concerns. And I think that's what Congress, one of the things Congress wanted to hit off. And so that, you know, that's my concern. Do you understand what I'm saying? Absolutely, Your Honor. And why don't I then just end my remarks here by referring back to the actual legislative history behind ICTA, because it confirms exactly what you're saying. You read the legislative history, I think there's two things that are of interest, should be of interest to the court. One is the obvious overarching interest in centralizing the regulation of the railroads at this federal agency. But also, in the House report, the Congress actually spoke of their desire to, quote, completely preempt, quote, state law. So I really do, I agree with you completely, Judge Wilkinson. You would have just, you'd be opening up floodgates of claims being brought in the wrong forum if you were to conclude that this type of cause doesn't fall sufficiently within the Interstate Commerce Act to accord with what is Congress's intent, which is to centralize the decision making at the federal level and completely preempt these type of state law claims. If there are no further questions from the court, I appreciate the extra time, and we'll await your decision. All right, if there are no further questions, I'll thank Mr. Adkins and ask Mr. Foster if he would come up and give his rebuttal argument. Thank you, Your Honor. And first, I'd like to respond to your concerns. They are valid concerns, and I agree 100 percent with the policy considerations. And those are taken care of by ordinary preemption doctrines. The U.S. Supreme Court has been very specific in stating that federalism concerns must be carefully addressed. This court said if a statute includes an express preemption, then it implies that things beyond that express preemption are not preempted. In this case, there is an express preemption clause within the relevant statute, and it does not address any of these things like keeping the corridors open. So the real test for complete preemption is what did Congress intend for this statute to do, and we do that by looking at how is it written. And it makes no comments whatsoever with regard to, hey, we need to keep property all together. We can't allow pieces to be carved off here and there. There's a separate tool for that, and that's the ordinary preemption doctrines. With regard to subject matter jurisdiction, we are constrained by the statute itself. What is the statute designed to protect and prevent? It's designed to protect federal control over economic regulation of rail transportation, not every state law that could ever possibly touch on rail operations. So I think any reading that would subsume all state laws in this case would expand too far beyond the permissible bounds of what Congress intended. And remember, this court's jurisdiction must be construed narrowly, and if there is a reasonable, plausible basis for it to remain in state court, it should remain there. Well, but there are a number of cases out there that take this term. You know, the whole question is what does regulation mean? And there have been a number of cases that have equated regulation with interference, and it's hard to see a claim that could interfere with the railroad's interest in drainage with its tracks, and I can't imagine an interest that is more vital to rail transportation than drainage of its tracks. You let water fester around there, you really jam things up. And there are a number of cases, I think a good many of them, that have equated the term regulation with interference. And the question I have is a state cause of action for adverse possession. That can be regulatory in the broadest sense. It doesn't have to be a formal reg. Regulation can come through a common law cause of action that would interfere in the most basic way with the operations of a railroad. We're not talking about some marginal or ancillary function of the railroad. We're talking about drainage, which is absolutely critical to the maintenance of the tracks. If I may, I see my time is running down. Go ahead. We're not saying that Norfolk Southern can't drain its tracks. All we're saying is it can't drain its tracks in a way that damages an adjoining landowner's property. And the Tenth Circuit has addressed that case. And the Tenth Circuit has held in the Emerson v. Kansas City Railway case that a railroad company is just like any other landowner and has to manage its runoff like any other landowner. There's a perfectly feasible way to do this. The drainage pipe actually runs underneath the rail lines. We're not even saying they have to move the pipe. All we're saying is that the way that the pipe is currently installed is damaging our property. And if I may, Governor? This is different from the kind of dispute between two neighbors where you have adjoining pieces of property between homeowner A and homeowner B and they fight over drainage between those two properties. This is a national railroad network where if there are drainage problems in one section of the overall transportation and they are left to fester, then that affects the whole. The part affects the whole in this context to a much greater degree than the typical adverse possession action. Most of the adverse possession actions that I have come across have dealt with a fairly discreet property dispute between adjoining householders and very few of them have arisen in this context which is an assertion of control over a vital function of transportation which as I mentioned earlier is part of the whole. And that context of this adverse possession action is very different from the ordinary adverse possession action that we have come to think of through our real property classes. And it's that difference in context it seems to me that makes this particular common law cause of action an interference of a basic nature and it regulates railroad operations as much as any statute or regulation ever could. And this is what I am concerned about. And it's just different from your ordinary real property dispute. Not just difference in degree, it's really different in kind. And I want to give my colleagues a chance to ask their questions and I also want to give you Mr. Adkins because I've appreciated your I mean Mr. Foster excuse me because I've appreciated your argument and I want to give you the last word. So you go ahead Mr. Foster. I'm going to ask Mr. Foster one question. Post and counsel seem to acknowledge the possibility without making any commitment on behalf of this client that either you could in the future if you're unsuccessful here or could have perhaps by amendment in the district court have brought a separate claim to have this property removed from the rail network and either have the district court consider that in the first instance or transfer it to the STB in effect as a condition precedent to making a claim in the state court if the property were removed. Is that something that you have considered previously or have a reason not to consider in the future if you were unsuccessful here? Your Honor, I certainly appreciate the question and I was caught a little off guard by the argument because it appeared nowhere in the briefs and I'm hearing it for the first time today. What I heard during the briefing was that we could have brought our claim Well, in fairness, counsel was responding to our questions I think. Well, Your Honor, and I'm getting back to my supplemental authorities letter. In response to my supplemental authorities letter they cited to a statute that they just heard oral argument agreed has no applicability and then referred to I believe he stated that the STB has crafted another mechanism for things that don't fall within the only statute which he referred me to. So there's no citation to this other mechanism that the surface transportation board has crafted. So I did not see anything during my review when I was drafting the complaint. Right now standing here, I don't know what the elements of this STB crafted mechanism is. I don't know if I can meet it. I can tell you, Your Honor, that I will exhaustively look through every potential avenue state and federal to get justice for my client. But I do want to go back to the launch case that says the federal cause of action must appear in the statute. It doesn't say, hey, go take a look at the STB and see what special mechanisms they may have created by decision. It says, hey, pull up the statute. What does the statute say? And in this case, the statute talks directly to economic regulation and doesn't touch on these matters. But, Your Honor, to the extent that if there is an adverse decision in this case against my client, I will certainly do my best to find whatever mechanism Norfolk Southerners Council is referring to here today. But it does not appear anywhere in the ICCTA as required under U.S. Supreme Court and this court's precedent in order to make a finding for the complete preemption doctrine to apply. All right. We thank you, sir. I'm sorry, Judge Wilkinson, you had a question on the table. If I just may respond to it. You were with regard to drainage being a part of rail transportation. And, again, I appreciate the time I've been granted, but just a very quick point, if I may, sir. Yes, Mr. Foster, I'd be happy to hear from you. 49 U.S.C. Section 101-02 contains the definitions section for the ICCTA. Subsection 6 relates to railroads, and railroads include a bridge, car, float, lighter, ferry, and intermodal equipment used by or in connection with a railroad. Subsection B, the road used by a rail carrier and owned by it or operated under an agreement. And C, a switch, spur, track, terminal, terminal facility, and a freight depot, yard, and grab used for or necessary for transportation. And transportation is defined under Section 9 as including A, a locomotive, car, vehicle, vessel, warehouse, wharf, pier, and I won't read the entire thing, but it goes on and states, Subsection B, services related to that movement, including receipt, delivery, elevation, transfer and transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property. No mention of drainage anywhere in the definition section, Your Honor. That is a function of a railroad operator that applies to every business. Whether you're interstate commerce or not, railroads are required to manage their surface water like any other property owner. That is not a concern of the ICCTA. It does not appear in the statute and should not be part of the court's consideration of whether or not the complete preemption doctrine applies in this case. All right. Mr. Foster, I appreciate your argument. Judge Haged, do you have further questions? No, sir. Thank you. Judge Diaz? I do not. Thank you. Okay. Mr. Foster and Mr. Atkins, thank you both for your arguments. I'm sorry, as I mentioned in the last case, that we can't come down and shake hands, but we very much appreciate the presentations that you've made in your service to your clients and to the court. Thank you both. Thank you, Your Honors. Thank you, Your Honor.
judges: J. Harvie Wilkinson III, G. Steven Agee, Albert Diaz